UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MARK R. LASKOWSKI and
RICHARD HALL,

                      *Plaintiffs*,

  -vs-

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

                      *Defendant.*

**DECLARATION OF
CAROL L. BISSONETTE**

Civil Action No. 5:11-cv-340
(GLS/ATB)

---

    **CAROL L. BISSONETTE**, of full age, declares as follows:

    1.    I am employed by Defendant, Liberty Mutual Fire Insurance Company ("Liberty") as a Senior Special Investigator. This Declaration is submitted in support of Liberty's motion for summary judgment dismissing the complaint pursuant to Fed. R. Civ. P. 56.

    2.    Liberty Mutual issued a fire insurance policy to the Plaintiffs bearing policy number H32-221-361798-900 for their second home at 5758 Mill Street, Eaton, New York, providing coverage during the subject period. A copy of the policy is attached as **Exhibit 1**.

    3.    I was assigned to conduct an investigation into this claim, and my investigation consisted of client interviews, inspecting the property, interviewing witnesses, interacting with counsel, attending the examinations under oath, monitoring the origin and cause investigation and the analysis of the contents appraisal process.

    4.    I interviewed the Plaintiffs and learned that they owned their home jointly, and had lived together as a couple for over 25 years. I also learned their financial condition was dire at the time of the fire. They had not paid the mortgage on the property in more than 2-1/2 years, and the bank had brought a foreclosure action which resulted in the property being scheduled for a

foreclosure sale in July 2009. However, Richard Hall filed for bankruptcy on July 27, 2009, which stopped the foreclosure of their home, although a rental property located on adjacent premises was actually lost in foreclosure because it could not be protected under the Bankruptcy Code. This Bankruptcy filing resulted in the discharge of $321,040 in short-term debt accumulated by Richard Hall, and is indicative of the Plaintiffs' financial situation. Since the fire occurred, the mortgagee has shown no interest in pursuing the foreclosure, but it has filed a claim with Liberty for its loss.

5. The Plaintiffs further advised me that their financial problems began when their New York City based catering firm lost its only significant client, the giant insurance agency, Marsh & McLennan, in November 2004. Almost overnight, their business, which had average annual gross sales of over $600,000, dropped by about 90%, and their efforts to replace that revenue stream were unsuccessful.

6. November 2004, was a particularly inopportune time to lose their business since they were deeply involved in a total renovation of the Stone House section of their early 19th century residence. They had already expended over $600,000, and were hoping to convert it to a bed and breakfast for retirement. However, their efforts to obtain additional funds to complete the renovation and open the B&B were unsuccessful, and they admitted their only chance of saving their equity in the property was a sale. However, the prospects for a sale were poor, particularly in view of the downturn in the real estate market. In the two years this property was listed for sale, it had only been shown three times, with no offers.

7. My investigation revealed that this fire occurred on Sunday, January 10, 2010, at 10:49 a.m., while Plaintiffs were at the residence preparing to return to their New York City apartment. Liberty's fire investigation revealed that the fire, located primarily on the second floor of the Stone House, was intentionally set with at least three separate points of origin. Laboratory

analysis confirmed the presence of ignitable liquids, known as medium petroleum distillates, at two locations in the master bedroom for which there is no reasonable explanation. The Plaintiffs dispute that the fire was intentionally set, claiming that it was caused by some non-specific electrical event occurring in the master bathroom. The Madison County Fire Coordinator has characterized the cause of the fire as "under investigation".

8. Proofs of loss for $1,001,805 were filed by public adjusters on behalf of the Plaintiffs for the building, and $1,099,266 for the contents, consisting primarily of a large collection of antique collectibles and furniture, which the Plaintiffs had accumulated over the years. However, they admitted their antique collectibles and furniture had lost more than a third of their value in recent years due to changing tastes and the recession affecting the viability of their retirement fund.

9. With this background, Liberty elected to exercise its option to conduct an examination under oath, which took place on May 18 and 19, 2011.

10. This policy contained the following language:

### SECTION 1 – CONDITIONS
\*\*\*

2. Your Duties After Loss. In case of loss to covered property, you must see that the following are done:
\*\*\*
    f. As often as we reasonably require:
\*\*\*
    (3) Submit to examination under oath, while not in the presence of any other "insured", and sign the same;

HO 00 03 04 91

(*See* Ex. 1, Policy).

11. Examinations under oath are crucial to Liberty's investigation of this type of fire loss where the cause of the fire was determined to be incendiary, and the insureds appear to have a strong financial motive to procure the fire.

12. The examination under oath process presented a special challenge in this case

since there were two insureds with a complicated financial picture that included: a bankruptcy; a failed business; a $1,000,000 ten-year renovation project of the insured building; an extremely large contents claim, including hundreds of art objects and collectibles; the prospects for opening a bed and breakfast; and the activities of the insureds on the date of the loss since they were actually present at the time the fire occurred, just to name a few of the broad topics which needed to be explored.

13. We anticipated the initial examinations under oath of both insureds would take the better part of two days, and would include a continued examination for up to two additional days since we did not believe we could adequately explore all relevant topics in two days. The policy, of course, provides for this eventuality since it requires that the insureds submit to examinations under oath as often as "we reasonably require". (*See* Ex. 1, Policy).

14. Following the first round of examinations under oath, the Plaintiffs were asked to appear for a continued examination under oath, and while the Plaintiffs agreed to appear, they conditioned their appearance on only answering questions on topics that were not previously covered. (*See* O'Connor Aff. ¶¶ 10-18).

15. The topics covered by Mr. O'Connor included the contents claim, building renovations, the cost of the renovations, financing the renovations, bankruptcy, origin of the fire, the insureds' financial situation, their activities on the date of the fire and numerous other topics. Virtually every topic was touched on, to some degree. Therefore, the Plaintiffs' refusal to testify any further about any topic discussed at the prior examination under oath was tantamount to a complete refusal to appear. (*See* Ex. Q to O'Connor Aff.).

16. If an insured is able to pick and choose which topics he will discuss, the examination under oath condition becomes a nullity.

17. Plaintiffs have willfully violated Liberty's right to an examination under oath, which has frustrated Liberty's effort to conduct a thorough and timely investigation into the fire at 5758 Mill Street, Eaton, New York.

18. On January 11, 2011, I issued a letter to the Plaintiffs rejecting their claim due to violations of the policy, including arson, fraud and breach of the policy condition requiring the insureds to appear for an examination under oath as often as reasonably required. A true and correct copy of this letter is attached as **Exhibit 2**.

I hereby certify that the foregoing statements made by me are true. I understand that if any of the foregoing statements made by me are willfully false, I am subject to punishment for perjury.

Dated: April 5, 2012

_____
Carol L. Bissonette