UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

MARK R. LASKOWSKI and RICHARD HALL,

            *Plaintiffs,*

-against-

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

           *Defendant.*

**DEFENDANT'S L.R. 7.1(A)(3) STATEMENT OF UNDISPUTED MATERIAL FACTS**
Civil Action No. 5:11-CV-340 (GLS/ATB)

---

    Defendant Liberty Mutual Fire Insurance Company, respectfully submits the following Statement of Undisputed Material Facts pursuant to L.R. 7.1(a)(3) in support of Defendant's motion for summary judgment pursuant to *Federal Rule of Civil Procedure* 56:

### Background & Failure to Cooperate

    1.    On January 10, 2010, a fire damaged property owned by Plaintiffs Mark R. Laskowski and Richard Hall located at 5758 Mill Street, Eaton, New York. (*See* Ex. A to O'Connor Aff., Compl. ¶¶ 7, 9.)

    2.    According to the Plaintiffs, the residence located on the property was used as their second home. (*See id.* ¶ 7.)

    3.    At the time of the fire, the property was insured by Defendant Liberty Mutual Fire Insurance Company ("Liberty") under policy H32-221-361798-900 (the "Policy"). (*See id.* ¶ 8; Ex. 1 to Bissonette Decl., Policy.)

    4.    On or about, February 8, 2010, the Plaintiffs submitted to Liberty their claim for the building loss (the "Building Claim") by filing a sworn statement in proof of loss in the amount of $1,001,805. (*See* Ex. F to O'Connor Aff., Building Claim Proof of Loss.)

5. On or about February 8, 2010, the Plaintiffs also submitted a claim for the building's contents (the "Contents Claim") by filing a sworn statement in proof of loss in the amount of $1,099,266. (*See* Ex. G to O'Connor Aff., Contents Claim Proof of Loss.)

6. The Plaintiffs subsequently revised the Contents Claim to approximately $700,000.00. (*See id.*)

7. In response to the Plaintiffs' claims, Liberty undertook an investigation into the facts and circumstances surrounding the loss, which included an investigation into the origin and cause of the loss, concluding the fire was intentionally set. (*See* Exs. H-T to O'Connor Aff.; Ex. 2 to Bissonette Decl., Liberty Mutual January 11, 2011 Disclaimer Letter.)

8. On April 16, 2010, as part of its investigation, Liberty demanded that Plaintiffs produce certain documents and appear for an examination under oath ("EUO") pursuant to Section 1 of the Policy. (*See* Ex. H to O'Connor Aff., April 16 Demand Letter.)

9. Section 1 of the Policy provides as follows:

**SECTION 1 – CONDITIONS**

\*\*\*

    **2.**    **Your Duties After Loss.** In case of a loss to covered property, you must see that the following are done:

\*\*\*

        **f.**    As often as we reasonably require:

            (1)    Show the damaged property;

            (2)    Provide us with records and documents we request and permit us to make copies; and

            (3)    Submit to examination under oath, while not in the presence of any other "insured" and sign same;

\*\*\*

HO 00 03 04 91

(*See id.*; Ex. 1 to Bissonette Decl., Policy.)

10. On May 18, 2010, the Plaintiffs' EUOs commenced. (*See* Exs. I & K to O'Connor Aff, Plaintiffs' 5/18/2010 EUO Transcripts.)

11. The EUOs lasted for two days. (*See* Exs. I & J to O'Connor Aff., Hall EUOs; Ex. K & L to O'Connor Aff., Laskowski EUOs.)

12. Plaintiff Laskowski testified for five (5) hours, yielding 191 pages of testimony. (*See* Ex. K to O'Connor Aff., Laskowski 5/18/10 EUO.)

13. Plaintiff Hall testified for eight (8) hours, yielding 341 pages of testimony. (*See* Exs. I & J to O'Connor Aff., Hall EUOs.)

14. On May 19, 2010, the second day of the examinations, counsel for Liberty and Plaintiffs agreed to continue the examination once the Plaintiffs had submitted the documents previously requested and returned fully executed transcripts. (*See* Ex. L to O'Connor Aff., Hall 5/19/10 EUO, at 343.)

15. At the conclusion of the examination, the following conversation occurred between counsel and Plaintiffs' counsel:

> Mr. O'Connor: That will conclude today's examination under oath. We are going to continue, of course, as soon as we get transcripts to you and reviewed, and we receive the claim documentation, which hopefully will be forthcoming shortly.
>
> Mr. Artese: Okay. We're done.

(*See id.*)

16. Thus, on May 19, 2010, Plaintiff's counsel, Mr. Artese, did not object to a continuation of the examination on a future date and instead said "okay." (*See id.*)

17. On or about July 15, 2010, Mr. O'Connor contacted Mr. Artese to reiterate the insurer's demand for missing documentation. (*See* Ex. M to O'Connor Aff., O'Connor July 15, 2010 letter.)

18. Mr. O'Connor again informed the Plaintiffs that Liberty would require a second EUO of each witness along with executed transcripts from the first examination. (*See id.*)

19. Mr. Artese responded to this letter on August 19, 2010, providing some of the documentation requested. (*See* Ex. N to O'Connor Aff., Artese August 19, 2010 letter.)

20. Three months after the EUOs, in this August 19, 2010 letter, Mr. Artese proclaimed, for the first time, that "no further EUOs are necessary or reasonable." (*See id.*)

21. Despite this willful refusal, Liberty issued a written demand for the continued EUO. (*See* Ex. O to O'Connor Aff., O'Connor September 15, 2010 letter.)

22. Mr. O'Connor noted that documents requested by Liberty had still not yet been provided by the Plaintiffs. (*See id.*)

23. Mr. O'Connor stated:

> "To date, we have not received any of these materials. Nonetheless, rather than wait for these materials to be provided, we believe that it is appropriate to schedule the continued examination under oath of the insureds. Once again, we believe that we ought to schedule two consecutive days, and propose that the examinations under oath be continued on September 30 through October 1, 2010."

(*See id.*)

24. Mr. Artese replied via e-mail on September 27, 2010, referencing the earlier refusal of the Plaintiffs to submit to a second EUO. (*See* Ex. P to O'Connor Aff., Artese September 27, 2010 email.)

25. Without citing any authority, Mr. Artese demanded, "please explain why you think further examinations are reasonable and necessary." (*See id.*)

26. Mr. Artese further stated:

> "Please let us know what other subject areas Liberty feels are necessary to explore so that we may further consider whether further EUOs are reasonable."

(*See id.*)

27. Another demand was made on October 6, 2010 by letter to the Plaintiffs' counsel. (*See* Ex. Q to O'Connor Aff., O'Connor October 6, 2010 Letter.)

28. In this correspondence, Mr. O'Connor stated:

> "During our last conversation, we discussed Liberty Mutual's request for an additional examination under oath of your clients because we had not fully explored all areas relevant to the company's inquiry during the first two days of depositions."

(*See id.*).

29. Mr. O'Connor stated that Liberty sought a continuation of the examinations as to the following issues, among others:

> "the insureds' financial position, the building claim for which a $1,000,000 proof of loss was filed, the history of the extensive building renovations, the circumstances of the fire, the observations of the insured who were, of course, present at the time of the fire and the contents claim which is represented in a $1,100,000 proof of loss."

(*See id.*)

30. Mr. O'Connor reminded the Plaintiffs of their duty to cooperate and the policy requirement to submit to EUOs. (*See id.*)

31. Mr. O'Connor specifically stated:

> "Please be advised that a refusal on the part of the insureds to appear for a further examination under oath may result in a forfeiture of their rights under the policy."

(*See id.*)

32. On November 17, 2010, Plaintiffs' counsel responded to Mr. O'Connor's letter, stating:

> "We believe it is inappropriate for Liberty Mutual to subject its Insureds to further questioning on the previously covered topics. Certainly, if this matter were in litigation, Liberty Mutual would not be entitled to bring the witnesses back for further deposition questioning on subject matters previously covered during two days of examination. We do not see any reason to deart from this rule for purposes of Liberty Mutual's claims investigation, especially since your examination of the Insureds on the subject topics was thorough and comprehensive."

(*See* Ex. R to O'Connor Aff., Artese November 17, 2010 Letter, at 1 (emphasis in original).)

33. Mr. Artese further stated that the Plaintiffs "will not submit to further questioning on such topics." (*See id.*)

34. As to new topics, Mr. Artese stated:

> "[W]e do not see much point in questioning the Insureds with respect to the proofs of loss at this time since those proofs were submitted merely to comply with Liberty Mutual's requirement that they be filed within 60 days of loss, and the damages suffered by the Insureds, including the costs to repair/replace and the value of the damaged contents, are still being analyzed."

(*See id.*)

35. Additionally, Mr. Artese stated that the examination must occur in New York City and not in Hamilton, New York. (*See id.*)

36. Mr. Artese made this demand despite the property's location in Madison County where the first EUO was held. (*See* Ex. K to O'Connor Aff., Laskowski 5/18/10 EUO; Ex. I to O'Connor Aff., Hall 5/18/10 EUO.)

37. In a letter dated December 3, 2010, Liberty again urged the Plaintiffs to abide by their contractual obligation to "submit to examination under oath" as often as Liberty "reasonably required." (*See* Ex. S to O'Connor Aff., O'Connor December 3, 2010 Letter.)

38. Mr. O'Connor warned Plaintiffs:

> "The statement that your clients '… will not submit to further questioning on [previously covered] topics." is tantamount to a refusal by the insureds to appear for a continued examination under oath on any subject other than the proofs of loss, since a review of the EUO transcript fails to reveal any topic that wasn't touched on, to some degree."

(*See id.*)

39. Mr. O'Connor rejected Mr. Artese's CPLR analogy, stating that the examinations were not conducted under the CPLR. (*See id.*)

40. Mr. O'Connor further stated that Plaintiff Hall had only testified for the equivalent of one day and Mr. Laskowski for slightly more than half of one day. (*See id.*)

41. In his letter, Mr. O'Connor also stated:

> "In view of the complexity of this $2 million claim, the need to continue the examinations under oath is manifest."

(*See id.*)

42. Mr. O'Connor then, for the final time and in writing, requested the Plaintiffs to appear for a continued EUO without restriction as to topics. (*See id.*)

43. On December 13, 2010, Mr. Artese responded with a final refusal by the Plaintiffs to appear for a further EUO. (*See* Ex. T to O'Connor Aff., Artese December 13, 2010 Letter.)

44. Mr. Artese claimed that Mr. O'Connor was able to ask all relevant questions after 4:31pm on May 19, 2010, stating:

> "Moreover, you chose to end your questioning of the insureds at 4:55p.m. on May 18[th] and at 4:31 p.m. on May 19[th]. No one precluded you from asking further questions of the witnesses at that time."

(*See id.*)

45. Mr. Artese then contradicts this statement and offers to produce the Plaintiffs but only on topics not previously covered, thereby conceding that additional questions were still necessary. (*See id.*)

46. Due to the refusal to comply with the policy conditions as to the EUO as well as Liberty's conclusion that the fire had been intentionally set by the Plaintiffs, Liberty denied coverage on January 11, 2011. (*See* Ex. 2 to Bissonette Decl., Liberty Mutual January 11, 2011 Disclaimer Letter.)

47. Liberty's denial letter states the policy condition of requiring submission to an EUO was violated "by the insureds who were asked by Liberty to appear for a continued examination under oath. The insureds agreed to appear but refused to answer any questions on topics which were the subject of previous questioning. (*See id.*)

48. Liberty further denied the claim based on a violation of the concealment or fraud clause by the insureds who "intentionally set fire to the building; concealed and misrepresented

their involvement in setting the fire; misrepresented their activities on the day of the fire and the surrounding circumstances in an effort to deflect the investigation." (*See id.*)

49. Liberty further denied the claim based on an exclusion in the policy which "bars coverage for the insured who caused, solicited or procured the fire for the purpose of collecting the proceeds of the fire insurance policy." (*See id.*)

50. Liberty also noted that the policy contains a provision whereby actions against the insurer are prohibited "unless the policy provisions have been complied with and the action is started within two years after the date of loss." (*See id.*)

51. Challenging this denial, Plaintiffs commenced this action against Liberty, seeking insurance coverage for the loss. (*See* Compl., Ex. A to O'Connor Aff.)

## The Contents Claim

### Ownership

52. Plaintiffs seek to recover approximately $700,000.00 for personal property allegedly lost in the fire. (*See* O'Connor Aff., at 2)

53. From about 1978, Plaintiffs jointly owned and operated a catering business. (*See* Ex. K to O'Connor Aff., Laskowski 5/18/10 EUO, at 20; Ex. I to O'Connor Aff., Hall 5/18/10 EUO, at 70-71.)

54. During that time period, and to the present, Plaintiffs also maintained a personal relationship, living together as a couple for over twenty-five years. (*See* Ex. I to O'Connor Aff., Hall EUO 5/18/10, at 92-94.)

55. Consistent with their personal and professional partnership, Plaintiffs maintained joint and equal ownership of all assets they acquired, including their personal property. (*See* Ex.

K to O'Connor Aff., Laskowsi 5/18/10 EUO, at 20-21; Ex. C to O'Connor Aff., Hall 8/23/11 Dep., at 150.)

    56.    Plaintiff Laskowski testified as follows:

> Q:    How do you and Mr. Hall divide up the profits?
>
> A:    Everything was set up 50/50 because of – because of the division of the division of talent and responsibilities. . . .
>
> Q:    So you complimented one another.
>
> A:    Yes. So everything was 50/50 so there would be no – also in the big run picture, just to avoid bickering, 50/50 was the way to go.
>
> Q:    All right. And was it that way in your personal lives as well?
>
> A:    Yes. Yes. Everything was 50/50.

(*See* Ex. K to O'Connor Aff., Laskowsi 5/18/10 EUO, at 20-21).

    57.    Plaintiff Hall corroborated this division of ownership as follows:

> Q:    . . . [I]sn't a fact that . . . historically you and Mark shared everything fifty-fifty in your business and in your personal lives. Isn't that so?
>
> A:    Historically, yes.

(*See* Ex. C to O'Connor Aff., Hall 8/23/11 Dep., at 150.)

    58.    The personal property comprising Plaintiffs' Contents Claim consists primarily of household goods and furnishings and an extensive antiques collection. (*See* Ex. K to O'Connor Aff., Laskowsi 5/18/10 EUO, at 21-23.)

59. Like all other personal assets acquired during Plaintiffs' partnership, Plaintiffs maintained joint and equal ownership of these items of property for many years before the fire. (*See* Ex. K to O'Connor Aff., Laskowsi 5/18/10 EUO, at 20-21; Ex. C to O'Connor Aff., Hall 8/23/11 Dep., at 150.)

60. According to Hall, "it pretty much [had] always been 50/50, there wasn't any question." (*See* Ex. I to O'Connor Aff., Hall 5/18/10 EUO, at 93.)

61. And as Hall further acknowledged, "Mark owned fifty percent of the household goods and . . . antiques and [he] owned the other half." (*See* Ex. C to O'Connor Aff., Hall 8/23/11 Dep., at 150.)

62. The greater part of the Plaintiffs' contents claim was the antique collection, which was: (1) purchased with profits from Plaintifs' catering business, (s*ee* Ex. K to O'Connor Aff., Laskowsi 5/18/10 EUO, at 58); and (2) acquired for both personal enjoyment and investment purposes, namely, as Plaintiffs' primary form of retirement savings, (*see, e.g., id.* at 22 (Laskowski testifying that he and Plaintiff Hall invested in the antiques "as [their] retirement"); Ex. I to O'Connor Aff., Hall 5/18/10 EUO, at 36-38 (Hall testifying to same)).

**Bankruptcy**

63. Prior to the fire, on July 27, 2009, Plaintiff Hall filed a voluntary bankruptcy petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of New York. (*See* Ex. U to O'Connor Aff., Bankr. Pet.; Ex. V to O'Connor Aff., Bankr. Court Docket Report.)

64. Schedule B of the petition required Hall to list and value all personal property then owned by him. (*See* Ex. U to O'Connor Aff., Bankr. Pet., at Schedule B.)

65. Hall listed several items of personal property in Schedule B, declaring the total value of that property as $40,485, with $38,000 of that amount attributed to two automobiles, $1,000 to "household goods and furnishings," $600 to "wearing apparel" and "rings and watches," $600 to "pots and pans, serving dishes," and the remaining $285 to cash on hand, checking account funds, and a dog. (*See id.*)

66. Hall's Schedule B disclosures made no mention of his half ownership interest in the sizeable antiques collection and household goods or furnishings now comprising the greater part of Plaintiffs' $700,000.00 contents claim. (*See id.*)

67. In explaining this omission, Hall admitted "transferring" ownership of the undisclosed property to Plaintiff Laskowski in 2009 to protect that property from the reach of bankruptcy creditors. (*See, e.g.*, Ex. J to O'Connor Aff, Hall 5/19/10 EUO, at 242-43; Ex. C to O'Connor Aff., Hall 8/23/11 Dep., at 148-52; Ex. D to O'Connor Aff., Hall 8/24/11 Dep., at 266.)

68. According to Plaintiff Hall, the claimed ownership "transfer" was not reduced to writing or otherwise memorialized. (*See* Ex. C to O'Connor Aff., Hall 8/23/11 Dep., at 148-50.)

69. As to the antiques, Hall testified as follows:

> Q: What did you list your antique collection for in the bankruptcy?
>
> A: I listed it as though it was Mark's property rather than mine.
>
> Q: Why did you do that?
> A: I think that would be obvious.
>
> Q: Not to me.
>
> Q: So why did you list it on the bankruptcy as though it were Mark's?

- 12 -

> A: Again, with my comment it would be obvious and I know it's obvious to you.
>
> Q: So, are you saying that you did not tell the bankruptcy court that you had an antique collection?
>
> A: That's correct.

(*See* Ex. J to O'Connor Aff, Hall 5/19/10 EUO, at 242-43.)

70. As to the household goods and furnishings, Hall testified that while his and Laskowski's current claim for that property is for at least $100,000, and that it "wouldn't surprise [him]" if it exceeded $750,000, he listed only $1,000 in his bankruptcy petition because the rest of the property "must belong to [Laskowski]." (*See* Ex. C to O'Connor Aff., Hall 8/23/11 Dep., at 148-50.)

71. Further, while acknowledging that he and Laskowski had historically shared equal ownership of all the household goods and antiques, Hall admitted that the ownership arrangement was "changed" to conceal his ownership interest from the bankruptcy court and his creditors. (*See id.* at 150-151.)

72. Specifically, Hall testified as follows:

> Q: And [the fifty-fifty division] changed at some point between the year 2000 . . . and the date July 27, 2009?
>
> A: Yes.
>
> Q: Correct? And do you have any idea when that was?
>
> A: I don't really. Probably sometime in 2009.
>
> Q: Sometime in 2009?
>
> A: Probably.
>
> Q: Did it—did the change have anything to do with the fact that you were filing a bankruptcy petition?

> A: Well quite honestly, yes.
>
> Q: And would it be fair to say that the change occurred because you knew that if you were to file the bankruptcy petition representing that you owned half of the personal property that you did own, that it would be given, in effect, to you creditors?
>
> A: Right.

(*See id.*)

73. In further confirming his concealment efforts, Hall added the following:

> "I've known other people that have filed bankruptcy in the past and its quite a common practice for a husband or a wife to put their personal property into one or the other's name who isn't filing. I certain wouldn't be the first one."

(*See id.* at 152.)

74. On October 27, 2009, the Bankruptcy Court granted Hall's petition and discharged Hall from $321,401 in short-term debt. (*See* Ex. W to O'Connor Aff., Discharge Order; Ex. C to O'Connor Aff., Ex. U to O'Connor Aff.,, Bankr. Pet., at Schedule F; Ex. C to O'Connor Aff., Hall 8/23/11 Dep., at 158.)

**DATED:** April 6, 2012

**HISCOCK & BARCLAY, LLP**

By: _____
Thomas J. O'Connor
Bar Roll No. 103475

*Attorneys for Defendant*
Liberty Mutual Fire Insurance Company
Office and Post Office Address
80 State Street
Albany, New York 12207-2543
Telephone: (518) 429-4276
Facsimile: (518) 427-3474
E-Mail: toconnor@hblaw.com