# EXHIBIT 3



**TERRENCE D. STRADFORD, Plaintiff/Counterclaim Defendant, GLOBAL IM-
PLANT DENTISTRY, INC., GLOBAL SURGERY ASSOCIATES, INC., CENTER
FOR OSSEOINTEGRATION & TRAUMA, INC., NATIONAL DENTAL & MED-
ICAL SUPPLY COMPANY, INC., SMILE HEALTH CENTER LAB., INC., Plain-
tiffs, - against - ZURICH INSURANCE COMPANY, ZURICH NORTH AMERI-
CAN INSURANCE COMPANY, ZURICH-AMERICA INSURANCE COMPANY,
NORTHERN INSURANCE COMPANY OF NEW YORK, Defend-
ants/Counterclaim Plaintiffs**

**02 Civ. 3628 (NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2002 U.S. Dist. LEXIS 24050*

**December 10, 2002, Decided
December 13, 2002, Filed**

**DISPOSITION:** [*1] Defendants' motion for summary judgement dismissing plaintiffs' amended complaint granted.

**COUNSEL:** For Terrence D Stradford, Global Implant Dentistry, Inc, Global Surgery Associates, Inc, Center for Osseointegration & Trauma, Inc, National Dental & Medical Supply Equipment Company, Inc, Smile Health Center Lab, Inc, PLAINTIFFS: Mark F Hughes, Jr, Little Silver, NJ USA.

For Zurich Insurance Company, Zurich North American Insurance Company, Zurich-America Insurance Company, Northern Insurance Company of New York, DEFENDANTS: Craig S Brown, Mound, Cotton Et Al, NY, NY USA.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

**MEMORANDUM AND ORDER**

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

Terrence D. Stradford, Global Implant Dentistry, Inc., Global Surgery Associates, Inc., Center for Osseointegration & Trauma, Inc., National Dental & Medical Supply Equipment Company, Inc., and Smile Health Center Lab, Inc., (collectively, "plaintiffs") commenced this action by filing a complaint in the Superior Court of New Jersey on January 14, 2002. [1] On March 4, 2002, Zurich Insurance Company, Zurich North American Insurance Company, [*2] Zurich-America Insurance Company, and Northern Insurance Company of New York ("Northern") (collectively, "defendants") removed the case to the United States District Court for the District of New Jersey. Defendants then answered the complaint, and also asserted several counterclaims against Dr. Stradford. The District Court, by Memorandum and Order dated May 6, 2002, granted defendants' motion to transfer the case to this Court. [2] In our Opinion and Order of September 9, 2002 we granted plaintiffs' motion to dismiss the First, Second, Fourth, Sixth, and Seventh Counterclaims against them on the grounds that these Counts failed to plead fraud with specificity, as required by *Fed. R. Civ. P. 9(b)*, granted plaintiffs' motion to dismiss the Fourth and Seventh Counterclaims for failure to state a claim, pursuant to *Fed. R. Civ. P. 12(b)(6)*, and granted defendants' motion for leave to amend their counterclaims, pursuant to *Fed. R. Civ. P. 15(a)*. [3] Pres-

2002 U.S. Dist. LEXIS 24050, *

ently before the Court is defendants' motion for summary judgment pursuant to *Fed. R. Civ. P. 56(b)* on the ground that Dr. Stradford breached his contractual obligations under the Insurance Policy by failing to cooperate in the investigation [*3] of his claim. [4]

> 1    Plaintiffs filed an amended complaint on January 15, 2002.
> 2    In the May 6, 2002, Memorandum and Order, District Judge Thompson also denied plaintiffs' motion to enjoin a related action between the parties in the Supreme Court of New York. .
> 3    On September 12, 2002, defendants filed a Second Amended Answer in which they re-alleged Counterclaims One through Seven. Because the present motion for summary judgment does not involve Counterclaims Four and Seven, we need not address plaintiffs' contention that defendants are precluded from re-alleging these particular counterclaims after our September 9, 2002 Opinion dismissing these counterclaims for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*.
> 4    As part of this summary judgment motion, defendants seek to have returned to them their payments in the amount of $ 151,154.74 which they advanced to Dr. Stradford before his Examination.

## BACKGROUND

[*4]  Dr. Stradford is a dentist who maintains an office in Staten Island, New York. As part of his practice, Dr. Stradford engages in dental implant surgery and, for a fee, he trains other dentists to perform dental implant surgery themselves. Defendants are affiliated corporate insurers. Northern, an affiliate of Zurich [5] issued a policy of insurance bearing number PAS 35380535 (the "Policy") on Dr. Stradford's office effective August 18, 1999, thereby insuring the premises until August 19, 2000. During this term, Dr. Stradford apparently failed to pay the required insurance premiums, and Northern cancelled the Policy from October 10, 1999 to December 13, 1999. On or about December 6, 1999, however, Dr. Stradford submitted a "no claims" letter certifying that he had no losses from October 19, 1999, to that date. He also resumed paying the premiums, and the Policy was reinstated on or about December 14, 1999. Dr. Stradford was notified of the reinstatement on or about January 9, 2000.

> 5    Although both parties agree that the policy was actually issued by Northern, *see Stradford v. Zurich Ins. Co.*, No. 02-588(AET) (D.N.J. May 6, 2002)Plaintiffs' Answering Mem. of Law at 7; Defendants' Reply Brief at 8, n. 4, the branch is-

suing the Policy was the "Zurich Group-Albany" with the Zurich logo clearly visible on the face of the policy. Indeed, in their Amended Complaint, plaintiffs admit that Northern is an affiliate of Zurich and that "the public and its representatives regard Zurich Insurance as the insurer, even where the policy in question is issued by a subsidiary or an affiliate." Am Compl. P 1G.

[*5]  Less than ten days later, Dr. Stradford filed a claim on the Policy. Dr. Stradford notified Northern that, "on January 17, 2000, [he] returned to his office from his vacation and found water dripping from frozen pipes and extensive water damage to his personal property and the interior of his office." Am. Compl. P 3A. He further notified Northern that certain dental implants, worth more than $ 100,000, which had apparently been stored in his office, "had become wet and [therefore] ruined." [6] *Id.* P 3B. Dr. Stradford submitted a claim under the Policy, and Northern made payments to Dr. Stradford in the amount of $ 151,154.74.

> 6    According to plaintiffs, "dental implants, once they become wet prior to implantation, cannot be sterilized [and the] manufacturer will not warrant the sterility of such wet implants." Am. Compl. P 4F.

After receiving these payments, Dr. Stradford then submitted an additional claim under the Policy totaling $ 1,385,456.70, consisting of $ 168,000.00 for property damage, and [*6]  a business interruption claim of $ 1,209,456.70. [7] Am. Compl. P 4X. Before making any further payments to Dr. Stradford, Northern demanded that Dr. Stradford submit to a deposition under oath concerning his claim, and a deposition was scheduled for June 28, 2000. [8] The deposition was adjourned, according to defendants, because Dr. Stradford failed to timely submit documents requested in connection with the Examination. Second Am. Counterclaims P 17. The deposition was finally commenced on July 19, 2000, but, at the end of the day, the following colloquy occurred between counsel for the insurer and Dr. Stradford:

> Q: Just, you know, as I said, we're not going to be able to finish today. Let me just cover one more thing.
>
> A: I didn't know I had that much stuff.
>
> Q: Well, it's multiple copies. You know what? The time is now - it's almost 20 to 5. We've been going pretty much straight with a very short lunch break since approximately 10:25. We're going to cease today. And *I'm going to be talking*

*to Dr. Stradford about rescheduling to continue and complete the examination under oath on another date.* The examination for today's session is now concluded.

Transcript of [*7]  Examination Under Oath of Terrance Stradford, DDS, taken on July 19, 2000, at 210:15-211:4 (emphasis supplied). Despite nine requests from his insurer, *see* Silverberg Dec. Exhs. K-P; R-T, Dr. Stradford never appeared for the continuation of the Examination, nor did he ever produce many of the documents requested during the Examination. [9] Second Am. Counterclaims P 19. Thus, defendants contend that Dr. Stradford's lack of cooperation constitutes a breach of plaintiffs' contractual obligation under the Insurance Policy. In relevant part, the Policy provided as follows:

**C. Duties In The Event Of Loss of Damage**

    1. In the event of loss or damage to Covered property you must:

        . . .

        f. As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

        . . .

        g. Send us a signed, sworn statement of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

        h. *Cooperate with us in the investigation or settlement of the claim.*

        . . .

    3. *We may examine any insured under oath* [*8]  , while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and

records. In the event of an examination, an insured's answer must be signed.

*See* Silverberg Dec. Exh.Y at 17.

    7   The so-called "business interruption claim" is comprised of $ 652,256.70 in "lost gross income," $ 557,200.00 in "negative impact on [Dr. Stradford's] practice," and $ 8,000 in accountant's charges. Am. Compl. P 4X.

    8   This demand was made pursuant to terms of the Policy itself. *See* Policy at 18 ("we may examine any insured under oath . . . about any matter relating to . . . the claim").

    9   Dr. Stradford apparently sent to a firm of certified public accountants, selected by the insurer, a large quantity of requested records, including his bank statements, his cash receipts log and carbon copies of receipts for cash paid by patients. *See* Stradford Decl. P 24. However, at oral argument held before this Court on November 25, 2002, Dr. Stradford's attorney admitted that Dr. Stradford failed to provide the insurance company with many of the other documents requested by the insurer during his Examination including highly significant financial documents.

    [*9]  By letter dated January 31, 2001, Northern disclaimed coverage for Dr. Stradford's claim based on Dr. Stradford's failure to appear for the continuation of the Examination, his failure to cooperate in the investigation of the Claim, and based on fraud and false swearing in connection with the submission of the Claim. *See* Silverberg Dec. Exh. T. Northern demanded the return of the $ 151,154.74 in advance payments it had made to Dr. Stradford pursuant to the Policy. *Id.* To date, Dr. Stradford has not returned this sum to Northern.

    Slightly less than one year later, plaintiffs commenced this suit seeking $ 1,385,456.70 on the Policy, less the $ 151,154.74 already paid, or $ 1,234,301.96. Am. Compl. at pp. 8-9. Defendants counterclaimed, asserting, *inter alia*, that Dr. Stradford "knowingly and willfully devised a scheme and artifice . . . to defraud defendants and obtain money by false pretenses and representations", *see* Second Am. Counterclaims P 23, and seeking the return of their advance payment of $ 151,154.74, punitive damages, and investigation expenses in excess of $ 2, 143.50. Second Am. Counterclaims P 39-41.

    Defendants now move for summary judgment on the grounds [*10]  that plaintiffs failed to comply with the cooperation clause of the Policy, thereby breaching their contract with Northern and precluding any recover under the Policy. [10]

10   This motion for summary judgment based on plaintiffs' lack of cooperation with Zurich is the same basis on which defendants' allege their third counterclaim. *See* Second Am. Counterclaims. P 42-46 (breach of contract claim). In their third counterclaim, defendants seek recovery of the $ 151, 154.74 as well as adjustment and investigation expenses in excess of $ 2,143.50. In the present summary judgment motion, defendants' only seek to have the $ 151, 154.74 returned.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is properly granted where the "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.'" *R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997)* [*11] (quoting *Fed. R. Civ. P. 56(c)*). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*.

In reviewing the record, we are required to assess the evidence "in the light most favorable to the non-movant and . . . draw all reasonable inferences in [the non-movant's] favor." *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)*. The mere existence, however, of an alleged factual dispute between the parties will not defeat a motion for summary judgment. In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving [*12] party." *Id. at 248* (internal quotation omitted).

### II. Choice of Law

Because the instant summary judgment motion is based on a breach of contract claim, we must first decide which state's law is applicable. Where jurisdiction is based on diversity, a federal court must apply the underlying conflict of law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 496-97, 85 L. Ed. 1477, 61 S. Ct. 1020 (1941)*. The New York Court of Appeals has rejected the traditional approach in contract cases that called for rigidly applying the law of the place where the contract was made or performed. *See Matter of Allstate Ins. Co. v. Stolarz, 81 N.Y.2d 219, 225, 613 N.E.2d 936, 597 N.Y.S.2d 904, 906 (1993)* ("These inflexible rules proved unsatisfactory because the location of the controlling events was sometimes fortuitous, did not reflect the parties' intentions, or was insignificant as against the location of other events."). Instead, the modern approach requires courts to apply a "center of gravity" or "grouping of contacts" which includes consideration of a variety of contacts such as the place of contracting, the [*13] places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties. *Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1030-31 (2d Cir. 1996)*.

Specifically, in cases involving insurance contracts, New York courts have looked to factors such as the location of the insured risk, the insured's principal place of business, the residence of the insured, where the policy was issued and delivered, the location of the broker or agent placing the policy, where the premiums were paid, and the insurer's place of business. *See, e.g., International Multifoods Corp. v. Commercial Union Ins. Co., 98 F. Supp. 2d 498, 502 (S.D.N.Y. 2000)*; *Northwestern Mutual Life Ins. Co. v. Wender, 940 F. Supp. 62, 65 (S.D.N.Y. 1996)*; *Massachusetts Casualty Ins. Co. v. Morgan, 886 F. Supp. 1002, 1005 (E.D.N.Y. 1995)*.

Here, since we find no choice of law provision contained in the Policy itself, we apply New York's "center of gravity" test and find that the factors clearly weigh in favor of New York law. [11] Dr. Stradford's place of business and the risk of loss were located [*14] in Staten Island, New York and the defendant insurers were licensed in New York. Nor is there evidence to suggest that the policy was issued, delivered, or negotiated outside of New York. [12]

11   we note that while neither party has specifically addressed the issue of choice of law, both parties primarily cite to New York case law in their respective briefs.

12   The only other state's law which could conceivably be applied in this case is the law of New Jersey, based on the fact that Dr. Stradford resides in New Jersey and that the contract may have been negotiated and/or issued and delivered to him in New Jersey. We note that even if New Jersey law were found to apply, our decision to grant summary judgment in favor of defendants would remain unchanged as New Jersey law is virtually identical to New York law in this area. Indeed, as in New York, New Jersey case law

supports the conclusion that the insured has a duty to cooperate with the insurance company's investigation of the claim. *See eg., In re Environmental Ins., 259 N.J. Super 308, 316-17, 612 A.2d 1338, 1342 (App. Div. 1992)* ("Cooperation clauses impose a duty on insureds to assist insurers in the conduct and defense of actions. To that end, insureds are generally required to provide all such information and assistance as the insurer may require."); *Kraynick v. Nationwide Ins. Co., 72 N.J. Super. 34, 39, 178 A.2d 50, 52 (App. Div. 1961)* ("The 'cooperation' clause in an automobile liability insurance policy is a material condition of the contract. It is designed generally to protect the interests of the insurer . . . as to enable the insurer to determine whether there is a genuine defense.")

#### [*15] II. Breach of the Cooperation Clause

Having decided that the law of New York applies in the instant matter, we now turn to the substance of the dispute between the parties. The sole ground on which defendants seek summary judgment is that Dr. Stradford breached the "cooperation clause" of his insurance policy by failing to appear for the continuation of Examination and provide the documents requested by the insurer at the first day of the Examination. Defendants contend, and we agree, that this breach precludes plaintiffs from recovering under the Policy and requires that plaintiffs return the advance payments made to them by Northern in the amount of $ 151,154.74.

Under New York law, it is well settled that the insured's cooperation is a condition precedent to coverage under an insurance policy and that summary judgment is appropriate where it is determined that an insured's conduct constitutes a breach of the policy's cooperation clause. Specifically, an insured's willful failure to appear for an examination under oath as required by a policy of insurance constitutes a material breach of the policy's cooperation clause and precludes the insured from recovering on the [*16] insurance contract. *See e.g. Maurice v. Allstate Ins. Co., 173 A.D.2d 793, 794, 570 N.Y.S.2d 654, 655 (2d Dept. 1991)* ("The law is well settled that the failure to comply with a policy provision requiring submission to an examination under oath, as often as may reasonably be required, is a material breach and will preclude an action to recover on the contract.") (internal citations omitted); *Bulzomi v. New York Central Mut. Fire. Ins. Co., 92 A.D. 2d 878, 459 N.Y.S.2d 861, 862 (2d Dept. 1983)* (reversing the trial court's denial of the insurance company's motion for summary judgment where "the record is indicative of a pattern of non-co-operation for which no reasonable excuse for noncompliance has been proffered. . . ."); *Dyno-Bite Inc.*

*v. Travelers Companies, 80 A.D.2d 471, 474, 439 N.Y.S.2d 558, 560-61 (4th Dept. 1981)* ("The right to examine under the co-operation clause of the insurance policy, is much broader than the right of discovery under the CPLR. By its terms, the insured promises to render full and prompt assistance to discover the facts surrounding the loss and anything less results in a breach of contract.")

Plaintiffs do [*17] not challenge defendants' contention that Dr. Stradford failed to appear for the continuation of the Examination. *See* Plaintiffs Local Rule 56.1 Statement P 10 and Defendant's 56.1 Response. Rather plaintiffs maintain that Dr. Stradford was excused from cooperating with the insurer's demands because the insurance company had already decided to reject Dr. Stradford's claim prior to requesting his Examination and was merely doing "what ever [sic] it could to delay paying Stradford's claims". *See* Answering Mem. at 4-5. We find no evidence in the record to support plaintiffs' claim. New York law requires that in order for an insured's non-cooperation to be excused, the insured must carry the heavy burden of demonstrating that the insurer intended to deny the claim prior to demanding the insured's cooperation. *See e.g. Varda, Inc. v. Ins. Co. of North America, 45 F.3d 634, 638 (2d Cir. 1995)* ("To establish repudiation, [the insured] had to show that [the insurance company] distinctly, unequivocally, and absolutely refused to perform its obligations under the policy.") Moreover, it has been specifically held that the "delay [on the part of the insurer] in [*18] investigating or resolving a claim will not, by itself, support a finding of repudiation." *Id. at 639.*

Here, the record indicates that prior to conducting the first part of Dr. Stradford's Examination, defendants did not in any way indicate to Dr. Stradford that they were planning to reject his claim. To the contrary, the evidence indicates that the defendants were actively investigating the claim and that they had already made payments to Dr. Stradford totaling $ 151,154.74. *See* Defendants' Local Rule 56.1 Statement P 6-7. Indeed, defendants demanded that Dr. Stradford produce documents in support of his claim and appear for the Examination *only after* receiving a revised claim by Dr. Stradford for property damage and business income loss exceeding one million dollars. *Id.* Furthermore, the insurer's demand for Dr. Stradford to appear at the Examination specifically stated that "neither this letter nor the examination under oath should be construed as a . . . denial of liability under the Policy." *See* Silverberg Dec. Exh. G. Thus, we find no evidence in the record to support plaintiffs' contention that the insurance company intended to repudiate or [*19] reject Dr. Stradford's claim before conducting an investigation so as to excuse Dr. Stradford's non-cooperation. [13]

13   As further support of their argument that the insurance company repudiated Dr. Stradford's claims before demanding that he appear at the Examination, plaintiffs allege that the questioner at Dr. Stradford's Examination conceded that some of his questions were "nonsense." See Answering Mem of Law at 3 (citing Examination Transcript page 29; Silverberg Decl. Exh. W). It is true that during the deposition, the examiner stated "enough of this "nonsense" in connection with whether Stradford's daughter was older or younger than her siblings. Dep. Tr. at 29. However, this does not support plaintiffs' contention that the Examination itself was mere "nonsense". Indeed, the comment can easily be read to indicate that the examiner believed it was time to turn to the heart of Dr. Stradford's claim.

Moreover, we note that the extraordinarily large amount of Dr. Stradford's business interruption claim combined with the fact that his revised claim was submitted to the insurance company approximately one week after he received the $ 151,154.74 payment provides ample support for the insurance company's skepticism of this claim. Thus, we find no merit to Dr. Stradford's suggestion that the insurance company engaged in the investigation of his claim without cause.

## [*20] III. Last Opportunity to Submit to the Examination

Plaintiffs next argue that Dr. Stradford must be granted a "last opportunity" to submit to an examination before summary judgment can be granted in favor of the insurance company. See Answering Mem. of Law at 3-4. We disagree. While New York law recognizes certain situations where an insured may be granted a "second chance" to comply with an insurance policy's cooperation clause [14], those cases are clearly distinguishable from the instant matter. Indeed, it has been consistently held that where the insured's conduct constitutes "willful" non-cooperation, the insured is not entitled to a "second chance" to comply with the cooperation clause. See Rosenthal v. Prudential Property & Co., 928 F.2d 493, 495 (2d Cir. 1991) ("New York courts have recently retreated from affording an insured a 'last opportunity' when the insured's refusal to cooperate is willful.")(internal citations omitted); Evans v. Int'l Ins. Co, 168 A.D.2d 374, 562 N.Y.S.2d 692, 694 (1st Dept. 1990) (reversing the trial court's denial of the insurance company's motion for summary judgment on the grounds that the insured's [*21] repeated failure, without reasonable explanation or excuse, to provide the requested information constituted a material breach of the policy and

that no "second chance" should have been given to the insured).

14   See e.g. Mistretta v. Hartford Accident & Indemnity Co., 275 A.D.2d 356, 356-57, 712 N.Y.S.2d 167 (2d Dept. 2000)(giving the insured a second chance where his non-cooperation in failing to answer questions and produce his tax returns was not so willful or extreme as to warrant the penalty of dismissal); Allstate Ins. Co. v. Loester, 177 Misc. 2d 372, 374, 675 N.Y.S.2d 832, 834 (N.Y. Sup. Ct Queens 1998) (holding that the insurer's mere claim that the insured "ignored correspondence" was insufficient to show lack of cooperation with additional factual proof in the record).

Here, the record indicates that defendants' representatives sent Dr. Stradford eleven letters over the course of almost six months seeking his cooperation. See Reply Mem. at 6; Silverberg Dec. Exhs. [*22] G-H, J-P, R-S. Dr. Stradford ignored many of these letters, and when he finally did respond, he avoided the issue of his non-cooperation entirely. [15] See Silverberg Dec. Exh. Q. In fact, it was not until January 18, 2002 - over a year and a half after defendants first demanded the Examination, two years from the date of the claimed loss, and almost a year after the insurance company had ultimately decided to decline coverage of the claim - when Dr. Stradford agreed, through his counsel, to continue the Examination. See Answering Mem. at 3.; Hughes Decl. containing January 18, 2002 letter from Mr. Hughes to Mr. Silverberg. As we find more than ample evidence to indicate that the Dr. Stradford's lack of cooperation was "willful", we will not now permit Dr. Stradford any additional opportunity to comply with the cooperation clause. [16]

15   At no time did Dr. Stradford or his attorney provide any excuse for his refusal to cooperate. Indeed, when he ultimately responded to the insurance company's demands, he refused and blamed defendants for "frittering his time away."

16   Our decision not to allow Dr. Stradford an additional opportunity to comply with the cooperation clause is also supported by significant public policy concerns. Insurers must be entitled to promptly obtain all material facts to enable them to decide upon their obligations and protect them against false claims. See e.g. Argento v. Aetna Casualty & Surety Co., 184 A.D.2d 487, 488, 584 N.Y.S.2d 607, 607(2d Dept. 1992) (holding that an insurance company is entitled to obtain information "promptly while the information is still fresh" and that "to permit [the insured] to give the information three years after

the fire would have been a material dilution of the insurance company's rights.") Thus, as a matter of public policy, we find it impermissible to allow an insured to willfully fail to comply with the insurer's demands and then to be afforded a "second chance" to comply once the evidence has become stale and the insurance company has been forced to spend considerable effort preparing to litigate the issue of the insured's non-cooperation.

## [*23] IV. The "Proper Insurer" to Demand Cooperation

Finally, plaintiffs argue that Dr. Stradford was under no obligation to comply with Zurich's demands for cooperation because it was the Northern Insurance Company, rather than Zurich, which issued the Policy at issue to the plaintiffs. In essence, plaintiffs argue that the "proper insurer" never demanded Dr. Stradford's cooperation. *See* Answering Mem. at 7-8. Because we do not find any evidence that Dr. Stradford ever objected to the Examination or continuation thereof on the grounds that the demand was not made by the "proper insurer" we do not find any merit to this claim. [17]

> 17    All letters sent to Dr. Stradford by Zurich's counsel both before and after his initial Examination make reference to the Policy at issue by providing the specific policy number. *See* Silverberg Dec. Exhs. G-H, J-P & R-S. Thus, it was clear that the demand for the Examination was pursuant to the terms of the Policy.

The record clearly indicates that plaintiffs repeatedly [*24] dealt with Zurich and its representatives as the "proper insurer." Indeed, Dr. Stradford notified Zurich of his loss in January 2000 and communicated with Zurich representatives to follow up on his claim. *See* Silverberg Reply Dec. Exh. 1. Thereafter, in a letter to Mr. Crosby of Zurich regarding the adjustment of his claim, Dr. Stradford acknowledged that the Compass Adjusters were representatives of Zurich, stating "I was told that the Zurich/Compass Adjustors was [sic] backed up with an inordinate amount of claims. . ." *See* Silverberg Reply Dec. Exh 2. It was Zurich's representatives who provided Dr. Stradford with the Proof of Loss form which Dr. Stradford filled out and signed, and that form was clearly directed to Zurich. *See* Silverberg Reply Dec. Exh. 3; Am. Compl. P4B. Moreover, in his amended complaint, Dr. Stradford admits that Northern, whose policy bears the Zurich logo, is an affiliate of Zurich and that "the public and its representatives regard Zurich Insurance as the insurer, even where the policy in question is issued by a subsidiary or an affiliate. *See* Am. Compl., PP 1C-H.

As a result, because we find that Dr. Stradford had been dealing with Zurich [*25] as the "proper insurer", throughout the entire process of pursuing his insurance claim, we do not find that he was excused from cooperating with Zurich's demands because it was Northern which actually issued the Policy to plaintiffs.

## V. Return of the Advance Payment

Having already decided that defendants are entitled to summary judgment on the grounds that plaintiffs breached the cooperation clause of the Policy, we now turn to the question of whether the insurance company is entitled to recover the $ 151,154.74 which it paid out to Dr. Stradford prior to its investigation of the claim.

In deciding this issue, we find persuasive a recent New York case in which the Appellate Division found that an insured's failure to return for an additional examination by the insurer not only constituted a material breach of the policy's cooperation clause but required any advance payments to the insured under the policy to be returned to the insurer. *See Somerstein Caterers of Lawrence, Inc. v. Insurance Co. of the State of Pennsylvania, 262 A.D.2d 252, 692 N.Y.S.2d 369 (1st Dept. 1999)*(affirming the trial court's finding that the insured's refusal of its president to [*26] appear for a third day of examination under oath and the refusal of the vice president/secretary/treasurer to testify unless the questioning was limited constituted a material breach of the policy's cooperation clause requiring that the insured to return the $ 200,000 in insurance proceeds advanced to it by the insurer). [18] Because we find that Dr. Stradford wilfully breached the cooperation clause of the Policy, he is precluded from recovering any Policy proceeds and we accordingly direct him to return the $ 151,154.74 in advance payments to the insurer. [19]

> 18    For the full text of the trial court's opinion, *see Somerstein Caterers of Lawrence, Inc. v. Insurance Co. of the State of Pennsylvania* No. 121661/96 (New York Supreme Court, October 30, 1998) at Silverberg Decl., Exh X.
>
> 19    We note that both parties have treated the $ 151, 154.74 as an "advance" to Dr. Stradford. Neither party has suggested that this sum was intended as a final payment.

## CONCLUSION

For the foregoing reasons, defendants' [*27] motion for summary judgment dismissing plaintiffs' Amended Complaint is granted. Furthermore, having breached the cooperation provision, we find that plaintiffs are not entitled to the advance payments made by the insurer and are hereby directed to return to the defendants $ 151,154.74.

2002 U.S. Dist. LEXIS 24050, *

**IT IS SO ORDERED.**

  DATED: New York, New York

December 10, 2002

NAOMI REICE BUCHWALD

UNITED STATES DISTRICT JUDGE